UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. **3:22-cr-34** |
| | ) | |
| v. | ) | **BILL OF INDICTMENT** |
| | ) | |
| (1) DONALD BOOKER | ) | 18 U.S.C. § 371 |
| (2) DELORES JORDAN | ) | 42 U.S.C. § 1320a-7b |
| | ) | 18 U.S.C. § 1956(h) |
| | ) | 18 U.S.C. § 1956(a)(1)(B)(i) |

**THE GRAND JURY CHARGES**:

At the specified time and at all relevant times:

### Introduction

1.  Beginning no later than January 7, 2016, and continuing until at least December 16, 2020, Defendant DONALD BOOKER, Defendant DELORES JORDAN, and others known and unknown to the Grand Jury operated a health care fraud and kickback scheme in the Western District of North Carolina and elsewhere. BOOKER, JORDAN, and their co-conspirators devised a scheme to defraud the North Carolina Medicaid Program by filing claims and obtaining over $15 million in payment from NC Medicaid for urine drug testing services that were not medically necessary and did not meet Medicaid policy requirements. BOOKER and his co-conspirators then used funds fraudulently obtained from NC Medicaid to pay over $2.5 million in illegal kickbacks to recruiters who provided the urine samples to BOOKER and his co-conspirators, including JORDAN.

### The Defendant and Related Persons and Entities

2.  United Diagnostic Laboratories (UDL) was a clinical medical laboratory in Greensboro, North Carolina, that provided urine toxicology testing.

3.  United Youth Care Services (UYCS), also doing business as United Youth and Adult Care Services, was a North Carolina corporation formed on June 10, 2013, with a registered office and mailing address in Greensboro, North Carolina. UYCS provided mental health and substance abuse treatment services and performed billing and other services for UDL.

4.  United Youth Care Foundation (UYCF) was a North Carolina non-profit corporation formed on December 2, 2009, with a registered office and mailing address in Greensboro, North Carolina.

5.  BOOKER was the owner of UDL, UYCS, and UYCF, and a resident of Greensboro, North Carolina and Charlotte, North Carolina.

1

6. Richard Graves, charged elsewhere, was the manager of UDL and the director of UYCS and a resident of Greensboro, North Carolina.

7. Legacy Housing Group LLC, also doing business as Daily Living Source LLC, was a North Carolina corporation formed on October 10, 2013, with a registered office and mailing address in Charlotte, North Carolina. Legacy Housing provided subsidized housing to tenants in Charlotte, Gastonia, King's Mountain, and Greensboro, North Carolina.

8. JORDAN was the owner of Legacy Housing and a resident of Charlotte, North Carolina.

9. D.J., S.H., and other Legacy Housing tenants were NC Medicaid-eligible beneficiaries that resided and submitted urine samples at Legacy Housing locations within the Western District of North Carolina.

10. Individual A was an employee of Legacy Housing and a resident of Greensboro, North Carolina. Individual A was the owner of Company 1, a North Carolina corporation formed on January 17, 2013, with a registered office and mailing address in Greensboro, North Carolina, and also received kickbacks from BOOKER.

11. Individual B was a resident of Matthews, North Carolina, and an owner of Company 2, a North Carolina corporation formed on December 20, 2018, with a registered office and mailing address in Greensboro, North Carolina, and also received kickbacks from BOOKER.

12. "Do It 4 The Hood Corporation" (D4H) was a North Carolina corporation formed on April 6, 2017, with a registered office and mailing address in Charlotte, North Carolina. D4H operated after-school programs in Charlotte, Greensboro, Winston-Salem, and Rocky Mount, North Carolina, among other locations, and received kickbacks from BOOKER.

13. Markuetric Stringfellow, charged elsewhere, was an owner of D4H and a resident of Charlotte, North Carolina.

14. Glenn Pair, charged elsewhere, was an owner of D4H and a resident of Charlotte, North Carolina.

15. Individual C was an employee of D4H and a resident of Charlotte, North Carolina.

16. JORDAN, Individual A, Individual B, Stringfellow, Pair, Individual C, and others known and unknown to the Grand Jury (collectively, "Recruiters") recruited Medicaid beneficiaries to provide urine samples, which Recruiters provided to UYCS for medically-unnecessary urine drug testing in exchange for a kickback from UYCS's NC Medicaid reimbursement.

2

## The NC Medicaid Program

17. NC Medicaid is a state-administered program aided by federal funds. NC Medicaid operates, in relevant part, as follows:

    a. NC Medicaid is a health care program that helps pay for reasonable and medically necessary services for qualifying, enrolled individuals and their families, referred to herein as beneficiaries. Covered services include urine drug testing as part of substance abuse treatment. The NC Medicaid Program is administered by the Division of Health Benefits, North Carolina Department of Health and Human Services (referred to herein as DHB, formerly known as the Division of Medical Assistance or DMA), which oversees mental health providers through the state who receive payments from Medicaid. The NC Medicaid system includes both traditional Medicaid and the North Carolina Health Choice for Children insurance program (NCHC). The NC Medicaid Program, DHB, and NCHC are collectively referenced herein as NC Medicaid.

    b. If qualified, an individual can enroll as a NC Medicaid beneficiary. At the time of enrollment, a beneficiary receives a unique alphanumeric code issued by the program, known as a Medicaid identification number. Beneficiaries use their Medicaid identification numbers to receive covered services.

    c. NC Medicaid beneficiaries receive services from medical practitioners (referred to herein as rendering providers) and companies (referred to herein as billing providers). Once a rendering provider or billing provider enrolls with NC Medicaid, the program issues a unique number to the provider, known as the provider number. Rendering providers and billing providers must also obtain a federal identification number, known as a National Provider Identifier or NPI number. All NC Medicaid rendering providers and billing providers must certify that they will only bill Medicaid for medically necessary services they actually perform.

    d. In order for a urine drug test to be covered by NC Medicaid, a provider laboratory is required to submit the rendering provider's NPI number, the NC Medicaid recipient's identifier number, dates of service, procedure code, and diagnosis code, among other information.

    e. Two main categories of urine drug tests covered by NC Medicaid are (1) presumptive urine drug tests and (2) definitive urine drug tests. A presumptive urine drug test determines the presence or absence of a drug class in a urine sample. A definitive urine drug test identifies specific medications, illicit substances, and metabolites of these drugs in a urine sample.

    f. A standing order is a request by a medical practitioner for repetitive testing of a single beneficiary to monitor a condition for a limited number of visits using a predetermined set of tests. A blanket order is a request by a medical practitioner for repetitive testing of all beneficiaries in a provider's practice without individualized decision-making at every visit.

3

Case 3:22-cr-00034-KDB-SCR   Document 1   Filed 02/15/22   Page 3 of 13

g.  Prior to November 1, 2017, NC Medicaid would accept drug-testing claims based on blanket orders for up to 20 presumptive drug tests per beneficiary each calendar year. NC Medicaid did not authorize claims for definitive drug tests based on blanket or standing orders. Before and after November 1, 2017, NC Medicaid required that an authorized medical provider certify that definitive drug tests are medically necessary for a particular beneficiary.

h.  On November 1, 2017, DMA issued Clinical Coverage Policy (No. 1S-8) governing Medicaid claims for drug testing for opioid treatment and controlled substance monitoring (the DMA Drug Testing Policy). The DMA Drug Testing Policy provides, in pertinent part, that:

i.  NC Medicaid covers drug testing when it is medically necessary and "is individualized, specific, and consistent with symptoms or confirmed diagnosis" and "not in excess of the beneficiary's needs;"

ii.  NC Medicaid covers up to 24 presumptive tests and 24 definitive drug tests per calendar year for each beneficiary;

iii.  A presumptive drug test is medically necessary when it is deemed appropriate by a medical professional as part of the evaluation and management of a beneficiary who presents with any one of a list of physical symptoms that may indicate drug use;

iv.  Drug tests for NC Medicaid beneficiaries diagnosed with a substance use disorder must be performed at random intervals to properly manage and monitor the beneficiary's care; and

v.  The reasons and drug testing frequency must be documented in the beneficiary's health record.

18.  NC Medicaid is a "health care benefit program," as defined in Title 18, United States Code, Section 24(b).

### Kickbacks and "Safe Harbors"

19.  Claims submitted to NC Medicaid that are the result of, or source of, a kickback and not a "safe harbor" violate the Anti-Kickback Statute.

20.  Safe harbors are exceptions to the Anti-Kickback Statute that allow certain legitimate and beneficial agreements and transactions between NC Medicaid providers and third parties.

21.  Personal services and management contracts and payments (hereinafter agency agreements) are a safe harbor. Payments made by a principal to an agent as compensation for the services of the agent do not violate the Anti-Kickback Statute. Agency agreements must meet

4

certain criteria to qualify as a safe harbor. Agency agreements intended to hide illegal kickback payments and circumvent the Anti-Kickback Statute do not qualify as a safe harbor.

## The Medicaid Fraud and Kickback Conspiracy

22. Recruiters identified NC Medicaid-eligible beneficiaries through subsidized housing programs operated by Legacy Housing, after-school programs operated by D4H, mental health and other clinics operated by Company A, Company B, and other means. Recruiters required Medicaid-eligible beneficiaries enrolled in these programs to submit urine specimens, to be provided to UDL for drug testing, as a condition of their continued involvement in the programs.

23. Recruiters obtained the personally identifiable information (PII) of Medicaid-eligible beneficiaries, such as their names, addresses, dates of birth, and Medicaid beneficiary numbers. Recruiters then submitted and caused to be submitted the beneficiaries' PII and urine specimens to UYCS and UDL.

24. Medical professionals with NPI numbers signed standing orders and other documents purportedly authorizing UDL's drug testing on the urine specimens as medically necessary. In exchange, those medical professionals were paid by UYCS.

25. BOOKER submitted and caused to be submitted fraudulent claims to NC Medicaid on behalf of UYCS for the medically-unnecessary tests performed by UDL, and NC Medicaid paid funds to UYCS in reimbursement for those claims.

26. Between January 7, 2016, and May 4, 2021, UYCS submitted over $20 million in claims to NC Medicaid on behalf of UYCS and received over $15 million in reimbursement for those claims. BOOKER and his co-conspirators caused UYCS to pay approximately $1.6 million in illegal kickbacks to JORDAN in exchange for medically unnecessary drug testing of urine provided under the names of actual Medicaid beneficiaries referred by JORDAN through Legacy Housing.

## The Identity Theft Conspiracy

27. BOOKER, JORDAN, and their co-conspirators transferred, possessed, and used, and caused others to transfer, possess and use, the PII of actual Medicaid beneficiaries in whose names they submitted Medicaid claims.

28. BOOKER, JORDAN, and their co-conspirators obtained the PII of Medicaid beneficiaries from recruiting programs managed by Recruiters and used the PII to input medically unnecessary drug testing claims into NC Medicaid's claims processing systems.

29. BOOKER, JORDAN, and their co-conspirators knew that the NC Medicaid-eligible beneficiary names and PII that they transferred, possessed, and used and caused others to transfer, possess and use belonged to actual persons because NC Medicaid would only accept claims for actual people who were determined to be Medicaid-eligible.

## The Money Laundering Conspiracy

30. BOOKER, JORDAN, and their co-conspirators agreed to conceal and disguise the nature and source of UYCS's illegal kickback payments to JORDAN for drug testing referrals.

31. The manner and means used to accomplish the money laundering conspiracy included, among others, the following:

   a. BOOKER transferred and caused to be transferred to JORDAN checks paid from UYCS containing false or misleading entries in the check memo lines, such as "housing expenses" or payroll for a listed pay period, and accounted for the checks with false or misleading entries, such as "payroll" or "contract labor." JORDAN deposited such checks at financial institutions in Charlotte, North Carolina, and elsewhere.

   b. In order to make the UYCS's illegal kickback payments to Recruiters for drug testing referrals appear to be regular payroll checks, BOOKER caused kickback payments to be made as payments of $5,000.00, with any excess kickback owed either paid by separate check or rolled over into the next kickback payment. JORDAN deposited such checks at financial institutions in Charlotte, North Carolina, and elsewhere.

   c. BOOKER caused UYCS to transfer funds obtained through the Medicaid fraud and kickback conspiracy to UYCF, then caused UYCF to pay the kickback payment checks to Recruiters, including JORDAN, Individual A, Individual B, and others known and unknown to the Grand Jury, often with false or misleading entries in the check memo lines, such as "Lab Marketing" or "Contract Services."

   d. BOOKER, knowingly and for the purpose of evading financial institutions' reporting requirements, caused and attempted to cause a domestic financial institution to fail to file a report required by law by directing kickback payments to JORDAN and other co-conspirators over $10,000.00 to be paid as multiple checks under $10,000.00, in violation of 31 U.S.C. § 5324.

   e. In an attempt to make the illegal kickback scheme appear to satisfy the agency agreement safe harbor to the Anti-Kickback Statute, BOOKER and JORDAN negotiated an unsigned agreement under which JORDAN would purportedly market UYCS's services in exchange for a percentage of all revenue generated by such services.

## COUNT ONE
## 18 U.S.C. § 371
## (Conspiracy)

32. Paragraphs 1 through 31 of this Bill of Indictment are realleged and incorporated by reference.

33. Beginning no later than January 7, 2016, and continuing until at least December 16, 2020, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendants,

**(1) DONALD BOOKER** and
**(2) DELORES JORDAN**

did knowingly combine, conspire, confederate, and agree with one another and persons known and unknown to the Grand Jury, (1) to defraud the United States and (2) to commit offenses against the United States, that is: (a) health care fraud in violation of Title 18, United States Code, Section 1347; (b) illegal kickbacks in violation of Title 42, United States Code, Section 1320a-7b; and (c) aggravated identity theft in violation of Title 18, United States Code, Section 1028A.

## Manner and Means

34. The conspirators carried out the conspiracy through the manner and means described in paragraphs 1 through 31 of this Bill of Indictment, among others.

## Overt Acts

35. In furtherance of the conspiracy and to effect the object thereof, there was committed by at least one of the conspirators, in the Western District of North Carolina and elsewhere, at least one of the following overt acts, among others:

   a. ***Acts Relating to Medicaid Beneficiary D.J.***:

      i. In or around 2015, the exact date unknown, JORDAN recruited D.J. to participate in a subsidized housing program operated by Legacy Housing in Charlotte, North Carolina.

      ii. In or about June 2017, JORDAN obtained and caused to be obtained a urine specimen from D.J. as a condition of D.J.'s continued residency in the housing program.

      iii. On or about June 13, 2017, BOOKER and his co-conspirators caused D.J.'s urine specimen to be tested at UDL.

      iv. On or about June 15, 2017, BOOKER and his co-conspirators submitted and caused to be submitted to NC Medicaid a claim on behalf of UYCS for urine drug testing using D.J.'s name and Medicaid number.

      v. On or about June 20, 2017, BOOKER and his co-conspirators caused NC Medicaid to pay UYCS approximately $223.69 for medically unnecessary drug testing claims using D.J.'s name and Medicaid number.

vi. On or about June 21, 2017, BOOKER and his co-conspirators provided a check in the amount of $1,452.60 to JORDAN, which amount included a kickback for NC Medicaid payments received by UYCS for drug testing in D.J.'s name.

vii. On approximately 36 occasions between April 15, 2016, and July 7, 2017, BOOKER and his co-conspirators submitted and caused to be submitted to NC Medicaid claims on behalf of UYCS for urine drug testing using D.J.'s name and Medicaid number, causing NC Medicaid to make payments totaling approximately $4,007.98 for medically unnecessary drug testing claims using D.J.'s name and Medicaid number.

viii. When submitting urine-testing claims in D.J.'s name to N.C. Medicaid, BOOKER knowingly caused D.J.'s PII and Medicaid number to be transferred, possessed, and used, without lawful authority.

b. ***Acts Relating to Medicaid Beneficiary S.H.*:**

i. In or around 2015, the exact date unknown, JORDAN recruited S.H. to participate in a subsidized housing program operated by Legacy Housing in Charlotte, North Carolina.

ii. In or about June 2017, JORDAN caused to be obtained a urine specimen from S.H. as a condition of S.H.'s continued residency in the housing program.

iii. On or about June 13, 2017, BOOKER and his co-conspirators caused S.H.'s urine specimen to be tested at UDL.

iv. On or about June 15, 2017, BOOKER and his co-conspirators caused claims to be submitted to NC Medicaid on behalf of UYCS for urine drug testing using S.H.'s name and Medicaid number.

v. On or about June 20, 2017, BOOKER and his co-conspirators caused NC Medicaid to pay UYCS approximately $223.69 for medically unnecessary drug testing claims using S.H.'s name and Medicaid number.

vi. On or about June 21, 2017, BOOKER and his co-conspirators provided a check in the amount of $1,452.60 to JORDAN, which amount included a kickback for NC Medicaid payments received by UYCS for drug testing in S.H.'s name.

vii. On approximately 33 occasions between April 12, 2016, and July 20, 2017, BOOKER and his co-conspirators submitted and caused to be submitted to NC Medicaid claims on behalf of UYCS for urine drug testing using S.H.'s name and Medicaid number, causing NC Medicaid to make payments totaling

8

approximately $4,077.06 for medically unnecessary drug testing claims using S.H.'s name and Medicaid number.

viii. When submitting urine-testing claims in S.H.'s name to N.C. Medicaid, BOOKER knowingly caused S.H.'s PII and Medicaid number to be transferred, possessed, and used, without lawful authority.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH SIX

### 42 U.S.C. § 1320a-7b
### (Anti-Kickback Statute)

36. Paragraphs 1 through 31 of this Bill of Indictment are realleged and incorporated by reference.

37. On or about the dates set forth below, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

### (1) DONALD BOOKER

did knowingly and willfully pay remuneration, including kickbacks and bribes, as set forth below, to a person, DELORES JORDAN, to induce the referral of NC Medicaid beneficiaries for the furnishing and arranging for the furnishing of services for which payment may be made in whole or in part under NC Medicaid, a Federal health care program:

| Count | Approximate Date | Kickback Amount | Check No. |
|---|---|---|---|
| 2 | June 14, 2017 | $841.45 | 5110 |
| 3 | June 21, 2017 | $1,452.60 | 1099 |
| 4 | July 6, 2017 | $4,263.98 | 5187 |
| 5 | November 15, 2017 | $11,589.72 | 13224 |
| 6 | November 24, 2017 | $12,450.76 | 13282 |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A).

## COUNTS SEVEN THROUGH ELEVEN
## 42 U.S.C. § 1320a-7b
## (Anti-Kickback Statute)

38. Paragraphs 1 through 31 of this Bill of Indictment are realleged and incorporated by reference.

39. On or about the dates set forth below, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

### (2) DELORES JORDAN

did knowingly and willfully solicit and receive remuneration, including kickbacks and bribes, as set forth below, in return for referring NC Medicaid beneficiaries to a person, DONALD BOOKER, for the furnishing and arranging for the furnishing of services for which payment may be made in whole or in part under NC Medicaid, a Federal health care program:

| Count | Approximate Date | Kickback Amount | Check No. |
|-------|------------------|-----------------|-----------|
| 7 | June 14, 2017 | $841.45 | 5110 |
| 8 | June 21, 2017 | $1,452.60 | 1099 |
| 9 | July 6, 2017 | $4,263.98 | 5187 |
| 10 | November 15, 2017 | $11,589.72 | 13224 |
| 11 | November 24, 2017 | $12,450.76 | 13282 |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(1).

## COUNT TWELVE
## 18 U.S.C. § 1956(h)
## (Money Laundering Conspiracy)

40. Paragraphs 1 through 31 of this Bill of Indictment are realleged and incorporated by reference.

41. From no later than June 14, 2017, through at least July 8, 2019, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendants,

**(1) DONALD BOOKER** and
**(2) DELORES JORDAN**

did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, *to wit*, to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of a specified unlawful activity, that is, health care fraud in violation of Title 18, United States Code, Section 1347, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

### Manner and Means

42. The conspirators carried out the conspiracy through the manner and means described in paragraphs 1 through 31 of this Bill of Indictment, among others.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS THIRTEEN THROUGH FIFTEEN
## 18 U.S.C. § 1956(a)(1)(B)(i)
## (Money Laundering)

43. Paragraphs 1 through 31 of this Bill of Indictment are realleged and incorporated by reference.

44. On or about the dates set forth below, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendants,

**(1) DONALD BOOKER** and
**(2) DELORES JORDAN**

did knowingly conduct and attempt to conduct the following financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity,

that is, health care fraud in violation of Title 18, United States Code, Section 1347, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, each transaction constituting a separate Count:

| Count | Posted Date | Amount | Check No. | Memo Description |
|---|---|---|---|---|
| 13 | April 2, 2019 | $5,000.00 | 18011 | Pay Period 03/11/2019 - 03/24/2019 |
| 14 | April 2, 2019 | $3,252.61 | 18024 | Pay Period 03/11/2019 - 03/24/2019 |
| 15 | June 20, 2019 | $2,805.01 | 20326 | Pay Period 06/03/2019 - 06/16/2019 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. §§ 982 and 28 U.S.C. § 2461(c). Under § 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by § 981(a)(1)(C). The following property so subject to forfeiture in accordance with sections 982 and/or 2461(c):

a. All property which constitutes or is derived from proceeds of the violations set forth in Counts One through Eleven of this Bill of Indictment;

b. All property involved in the violations set forth in Counts Twelve through Fifteen of this Bill of Indictment; and

c. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) and (b) cannot be located upon the exercise of due diligence, has been transferred or sold do, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant to the extent of the value of the property described in (a).

The following property is subject to forfeiture on one or more of the grounds stated above: a forfeiture money judgment for all currency and monetary instruments that were involved in the crimes alleged in this Bill of Indictment, including but not limited to the sum of approximately $2,565,323.

A TRUE BILL

GRAND JURY FOREPERSON

DENA J. KING
UNITED STATES ATTORNEY

GRAHAM R. BILLINGS
ASSISTANT UNITED STATES ATTORNEY

13

Case 3:22-cr-00034-KDB-SCR   Document 1   Filed 02/15/22   Page 13 of 13